UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| THOMAS ANTHONY MALEC, III, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-919 |
| | ) | |
| v. | ) | Honorable Robert J. Jonker |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

This is a social security action brought under 42 U.S.C. §§ 405(g), 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security finding that plaintiff was not entitled to disability insurance benefits (DIB) and supplemental security income (SSI) benefits. On October 2, 2007, plaintiff filed his applications for DIB and SSI benefits.[1] He alleged a February 1, 2007, onset of disability.[2] (A.R. 156-61). His disability insured status expired on March 31, 2008. Thus, it was plaintiff's burden on his claim for DIB benefits to submit evidence demonstrating that he was disabled on or before March 31, 2008. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

---

[1]October 2, 2007, is the protective filing date. "Protective filing date" is the term used for the first time an individual contacts the Social Security Administration about filing for benefits. *See* http:// www.ssa.gov/glossary.htm (last visited Nov. 4, 2014). A protective filing date allows an individual to have an earlier application date than the date the signed application is actually filed. *Id.*

[2]SSI benefits are not awarded retroactively for months prior to the application for benefits. 20 C.F.R. § 416.335; *see Kelley v. Commissioner*, 566 F.3d 347, 349 n.5 (3d Cir. 2009); *see also Newsom v. Social Security Admin.*, 100 F. App'x 502, 504 (6th Cir. 2004). The earliest month in which SSI benefits are payable is the month after the application for SSI benefits is filed. Thus, November 2007 is plaintiff's earliest possible entitlement to SSI benefits.

Plaintiff's claims were denied on initial review. On July 19, 2010, he received a hearing before an ALJ, at which he was represented by counsel. (A.R. 38-85). On July 27, 2010, the ALJ issued his decision finding that plaintiff was not disabled. (A.R. 24-31). On June 18, 2013, the Appeals Council denied review (A.R. 1-3), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a timely complaint seeking judicial review of the Commissioner's decision. He argues that the Commissioner's decision should be overturned on the following grounds:

1.　　The ALJ committed reversible error by "not properly considering" the opinion of plaintiff's treating psychiatrist; and

2.　　"The ALJ did not have substantial evidence to support his finding that Plaintiff could have performed any full-time work because his opinion failed to mention significant evidence in the Record and because he improperly weighed the evidence."

(Plf. Brief at 18, docket # 15). I recommend that the Commissioner's decision be affirmed.

## Standard of Review

When reviewing the grant or denial of social security benefits, this court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law. *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the court's review is limited. *Buxton*, 246 F.3d at 772. The court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations. *See Ulman v.*

-2-

*Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference." *Buxton*, 246 F.3d at 772-73. "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently." *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion."). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from February 1, 2007, through March 31, 2008, but not thereafter. (A.R. 26). Plaintiff had not engaged in substantial gainful activity on or after February 1, 2007. (A.R. 26). Plaintiff had the following severe impairments: polysubstance abuse, anxiety and panic disorders,

and depression.[3]  (A.R. 26).  Plaintiff did not have an impairment or combination of impairments

which met or equaled the requirements of the listing of impairments.  (A.R. 27).  The ALJ found that

plaintiff retained the residual functional capacity (RFC) for a full range of work at all exertional

levels, but with the following nonexertional limitations: "work limited to simple, routine and

repetitive tasks in a work environment free of fast-paced production requirements involving only

simple, work related decisions; with few, if any, work place changes." (A.R. 27).  The ALJ found

that plaintiff's testimony regarding his subjective limitations was not fully credible:

> Claimant testified, on his own behalf, that he lives with his father and does not pay rent.  His
> father is a retired doctor.  Claimant has a GED and can read, write, and do simple math.  He
> remembers taking an I.Q. test years ago and told he has an I.Q. of 90.  He gets food stamps
> and has no other source of income.  He has had several jobs but some days he gets sick and
> cannot get out of bed.  He is scared but does not know why.  Claimant denies drinking and
> using drugs.
>
> Claimant testified that he has difficulty communicating with people.  I note the claimant
> communicated very well during the hearing.  He responded appropriately and with logical
> and pertinent answers.  He did not appear scared or uncomfortable.  He did not require
> prompts or ques.  He followed the proceedings.
>
> After careful consideration of the evidence, I find that claimant's medically determinable
> impairments could reasonably be expected to cause the alleged symptoms; however, the
> claimant's statements concerning the intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are inconsistent with the above residual
> functional capacity assessment.

_____

[3]It is undisputed that plaintiff has a significant substance abuse history: "In this case, there
is no doubt that there is evidence of substance abuse." (Plf. Brief at 20).  Since 1996, the Social
Security Act, as amended, has precluded awards of DIB ad SSI benefits based upon alcoholism and
drug addiction.  *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. §§ 404.1535, 416.935;
*see also Bartley v. Barnhart*, 117 F. App'x 993, 998 (6th Cir. 2004); *Hopkins v. Commissioner*, 96
F. App'x 393, 395 (6th Cir. 2004).  The claimant bears the burden of demonstrating that substance
abuse was not a factor contributing to his disability.  *See Cage v. Commissioner*, 692 F.3d 118, 122-
25 (2d Cir. 2012); *see also Zarlengo v. Barnhart*, 96 F. App'x 987, 989-90 (6th Cir. 2004).  Because
plaintiff was found not to be disabled, the ALJ was not required to decide the issue of whether
substance abuse was material to a finding of disability.  *See Gayheart v. Commissioner*, 710 F.3d
at 380.

A review of the medical record reveals that in September 2007, at the time of admission to the Salvation Army Turning Point Program, claimant was assigned a Global Assessment of Functioning of 50, which indicated serious level of symptoms but that improved with treatment (Ex 6F/4/6). In April 2008, claimant reported living with his father and having a social life with friends and family. He maintained his activities of daily living. He cooks. He completed some household tasks. Although he was diagnosed with polysubstance dependence, generalized anxiety disorder, panic disorder, and dysthymic disorder, he was assigned a GAF of 58, indicating a moderate level of functioning (Ex 13F). Notably, a GAF of 61 would indicate some mild symptoms.

Claimant testified that he never took any street drugs and never drank a lot. He admitted getting Vicodin off the street for depression but he never took 30 pills a day.

In September 2008, claimant sought help from Network 180 for "uncontrollable opiate abuse," and some problems with depression and anxiety. He was ingesting about 30 Vicodin pills per day, nearly every day and recent use of OxyContin, alcohol and nicotine. He believed his mental health symptoms were directly related to his drug use. He denied all typical indicators of a current mental health crisis and was not seeking any mental health treatment services. He denied engaging in any self-injurious behaviors. He attributed his limited self-care to "doing drugs or trying to figure out how I can get more drugs." Initially, claimant was diagnosed with opioid dependence, generalized anxiety disorder, major depressive disorder, and alcohol abuse. The following months, his diagnosis details showed generalized anxiety disorder and major depression, recurrent, unspecified (Ex. 20F).

Claimant admitted that he used his father's number to get drugs.

* * *

After careful consideration of all the evidence, I find that the claimant is less than credible regarding his alleged limitation and inability to function on a full-time, competitive basis.

(A.R. 27-31). The ALJ found that plaintiff was not disabled at step 4 of the sequential analysis because he was capable of performing his past relevant work as a cashier, "as actually and generally performed."[4] (A.R. 31).

---

[4]"Administrative law judges employ a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Social Security Act." *Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). Under the sequential analysis, "The claimant must first show that []he is not engaged in substantial gainful activity. Next, the claimant must demonstrate that []he has a 'severe impairment.' A finding of 'disabled' will be made at the third step if the claimant can then demonstrate that h[is] impairment meets the durational requirement and 'meets or equals a listed

**1.**

Plaintiff relies on evidence that he never presented to the ALJ.  (Plf. Brief at 18 and Exhibit 1; Reply Brief at 5).  This is contrary to well-established law within the Sixth Circuit, which holds that this court must base its review of the ALJ's decision on the administrative record presented to the ALJ.  *See Jones v. Commissioner*, 336 F.3d at 478; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993); *see also  Osburn v. Apfel*, No. 98-1784, 1999 WL 503528, at * 4 (6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a hearing before the ALJ.").  The court is not authorized to consider plaintiff's proposed additions to the record in determining whether the Commissioner's decision is supported by substantial evidence and whether the Commissioner correctly applied the law.  *See Cline*, 96 F.3d at 148.

The last sentence of plaintiff's brief contains a passing request for alternative relief in the form of remand.  (Plf. Brief at 21).  His reply brief concludes with an identical request. (Reply Brief at 6, docket # 17).  There is no developed argument or legal authority supporting either request.  Issues raised in a perfunctory manner are deemed waived.  *See Clemente v. Vaslo*, 679 F.3d

---

impairment.'  If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that []he is incapable of performing work that []he has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.  The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work."  *White v. Commissioner*, 572 F.3d 272, 282 (6th Cir. 2009).

482, 497 (6th Cir. 2012); *see also Moore v. Commissioner*, 573 F. App'x 540, 543 (6th Cir. 2014); *Curler v. Commissioner*, 561 F. App'x 464, 475 (6th Cir. 2014) (Where the claimant fails to develop an argument supporting a request for remand, "the request is waived.").

Even assuming that this issue had not been waived, plaintiff has not addressed, much less satisfied his statutory burden for remanding this matter to the Commissioner for consideration of new evidence under sentence six of 42 U.S.C. § 405(g).  "A district court's authority to remand a case for further administrative proceedings is found in 42 U.S.C. § 405(g)." *Hollon v. Commissioner*, 447 F.3d 477, 482-83 (6th Cir. 2006).  The statute permits only two types of remand: a sentence four (post-judgment) remand made in connection with a judgment affirming, modifying, or reversing the Commissioner's decision; and a sentence six (pre-judgment) remand where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *Hollon*, 447 F.3d at 486 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991)); *see Allen v. Commissioner*, 561 F.3d 646, 653-54 (6th Cir. 2009).  The court cannot consider evidence that was not submitted to the ALJ in the sentence four context.  It only can consider such evidence in determining whether a sentence-six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster v. Halter*, 279 F.3d at 357.

Plaintiff has the burden under sentence six of 42 U.S.C. § 405(g) of demonstrating that the evidence he now presents in support of a remand is "new" and "material," and that there is "good cause" for the failure to present this evidence in the prior proceeding.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276 (6th Cir. 2010).  Courts "are not free to dispense with these statutory requirements." *Hollon*, 447 F.3d at 486.  Plaintiff has not addressed, much less carried, his burden.  *See Ferguson*, 628 F.3d at 276.

-7-

Plaintiff places great emphasis on a subsequent decision by a different ALJ who found that plaintiff was disabled on March 30, 2012, and entitled to an award of SSI benefits: "The most powerful evidence in this case is evidence that occurred thereafter; that is, on August 30, 2012, when another ALJ who actually reviewed and understood the evidence issued a fully favorable decision in this case." (Plf. Brief at 18) (citing Exhibit 1, docket # 15-1). This argument suffers from a number of fatal flaws. The most obvious deficiency is that what plaintiff characterizes as "the most powerful evidence" was not, and is not, evidence in this case. Further, the fact that a different ALJ, presented with a different administrative record, found that plaintiff was disabled in 2012, does nothing to undermine the administrative decision under judicial review in which an ALJ found that plaintiff was not disabled during the period from his alleged onset of disability on February 1, 2007, through July 27, 2010.

In *Allen v. Commissioner*, 561 F.3d 646 (6th Cir. 2009), the Sixth Circuit held that a subsequent administrative decision awarding benefits does not satisfy the plaintiff's burden under sentence six: "[A] subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g)." 561 F.3d at 653. "Under sentence six, the mere existence of a subsequent decision in [plaintiff's] favor, standing alone, cannot be evidence that can change the outcome of his prior proceeding. A subsequent favorable decision may be *supported* by evidence that is new and material under § 405(g), but the decision is not itself new and material evidence." 561 F.3d at 653. The Sixth Circuit explained that consideration of the result achieved on a subsequent application for benefits as "new evidence" under sentence six would be inconsistent with the statutory purpose of a sentence-six remand and would be contrary to controlling Supreme Court precedent. *See id.* The mere fact of a subsequent

favorable decision cannot be deemed "new evidence" under these authorities.  The only legitimate

effect of the subsequent proceedings would arise from evidence considered in those proceedings that

bears on plaintiff's condition on or before March 31, 2008, regarding his claim for DIB benefits, and

on or before July 27, 2010, regarding his claim for SSI benefits.  *See Nichols v. Commissioner*, No.

1:12-cv-995. 2014 WL 4259445, at * 8 (W.D. Mich. Aug. 28, 2014).  Plaintiff did not submit any

new medical evidence in support of his request for a sentence-six remand.  The subsequent decision

finding that plaintiff was disabled on March 30, 2012,  does not provide a basis for remanding this

case to the Commissioner under sentence six of 42 U.S.C. § 405(g).

      Plaintiff has not demonstrated that remand pursuant to sentence six of  42 U.S.C. §

405(g) is warranted.  I recommend that plaintiff's request for a sentence six remand be denied.

Plaintiff's arguments must be evaluated on the record presented to the ALJ.

**2.**

      Plaintiff argues that the  ALJ committed reversible error because his opinion never

mentioned the treatment and opinions provided by Dr. Orellana.  (Plf. Brief at 18) (citing A.R. 494-

95, 557-63).  Specifically, he argues that the ALJ failed to give appropriate weight to Global

Assessment of Functioning (GAF) scores provided by Dr. Orellana:  "In this case, the records of Dr.

Orellana demonstrated Plaintiff had a consistent GAF score that would have made him considered

to be disabled." (Plf. Brief at 19).  GAF scores are subjective rather than objective assessments, and

they are not entitled to any particular weight.  *See White v. Commissioner*, 572 F.3d 272, 276 (6th

Cir. 2009) ("GAF examinations measure psychological, social, and occupational functioning on a

continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental

limitations."); *see also Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) *(*"GAF is a

clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). The DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS' (DSM-IV's) explanation of GAF scale indicates that "a score may have little or no bearing on the subject's social and occupational functioning."[5] *Kornecky v. Commissioner*, 167 F. App'x 496, 511 (6th Cir. 2006); *see Oliver v. Commissioner*, 415 F. App'x 681, 684 (6th Cir. 2011). "Significantly, the SSA has refused to endorse the use of the GAF scale." *Bennett v. Commissioner*, No. 1:07-cv-1005, 2011 WL 1230526, at * 3 (W.D. Mich. Mar. 31, 2011).

Further, the issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1) 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004). A treating physician's opinion that a patient is disabled is not entitled to any special significance. *See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the

---

[5] "[T]he latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) no longer includes the GAF scale." *Davis v. Commissioner*, No. 1:13-cv-1556, 2014 WL 4182737, at * 8 (N.D. Ohio Aug. 21, 2014); *see Finley v. Colvin*, No. 12-7908, 2013 WL 6384355, at * 23 n. 9 (S.D.W.V. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool."). " 'It was recommended that the GAF be dropped from the DSM-5 for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice.' " *Brown v. Colvin*, No. 12-513, 2013 WL 6039018, at * 7 n. 3 (E.D. Wash. Nov.14, 2013) (quoting DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 16 (5th ed., 2013)); *see Anderson v. Colvin*, No. 13-C-788, 2014 WL 5430275, at * 2 n.6 (E.D. Wisc. Oct. 24, 2014). "Moreover, a GAF score reflected an individual's functioning at a particular moment in time; one score was generally not helpful in determining whether Plaintiff's alleged impairment lasted at least 12 months, as is required to be considered disabled. *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a)." *Davis v. Commissioner*, 2014 WL 4182737, at * 8.

Commissioner, not the treating physician."). Likewise, "no special significance"[6] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the requirements of a listed impairment because they are administrative issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference. *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011). "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician. Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'" *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir. 2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)). A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). An opinion that is based on the claimant's reporting of his symptoms is not entitled to controlling weight. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see*

---

[6]"We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section." 20 C.F.R. § 404.1527(d)(3).

*also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even under circumstances in which a treating source's medical opinion is not given controlling weight, it should not necessarily be completely rejected. The weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors. *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff claimed a February 1, 2007, onset of disability. He started seeing Dr. Orellana more than a year later, on March 31, 2008. During the period from his alleged onset of disability through March 31, 2008, plaintiff received treatment from a number of physicians, including Peter App, M.D., at App Family Medicine and Creston Medical Center, and Mark Kemp, M.D., at Advantage Health Cascade Clinic. (A.R. 209-10, 313). These doctors were not aware that plaintiff was obtaining prescription medications from numerous other sources. For example, in

February 2007, plaintiff appeared at the St. Mary's Health Care emergency room on multiple dates seeking pain medication.  On February 2, 2007, plaintiff reported that approximately a week earlier he had been "lifting some heavy boxes" and began experiencing back pain.  X-rays showed "some disc space narrowing at L5-S1, but no obvious fracture, dislocation, or subluxations[.]" (A.R. 645). Plaintiff was diagnosed with a lumbar sprain, given a prescription for Vicodin, and was advised to rest.  (A.R. 646).  Plaintiff returned to the emergency room at St. Mary's on February 8, 2007.  He stated that he had injured his back at work, and that he could not follow-up with an orthopedic doctor until next week.  Plaintiff received prescriptions for Vicodin, Valium, and Motrin, and was advised to follow-up with his physician.  (A.R. 643-44).  Plaintiff next appeared at the emergency room on February 12, 2007.  He stated that he had been evaluated on many occasions by his primary care provider for back pain, but complained that his physician has done nothing for his back pain, and that was why he came to the emergency room.  (A.R. 640).  Plaintiff stated that could not recall any injury or trauma, "but was lifting boxes earlier in the week," and thought that it was the cause of the flare in his back pain.  He reported that he "ran out of his Valium, Vicodin, and Motrin, and that is why he decided to come back to the ER." (A.R. 640).  Plaintiff represented that he had an appointment scheduled with his psychiatrist later in the week.  (A.R. 640).  Plaintiff's strength was 5/5 in his upper and lower extremities.  His gait was normal.  (A.R. 641).  Philip Valentine, M.D., noted plaintiff's frequent use of the emergency room to obtain medications.  He agreed to provide plaintiff with very small quantities of Ativan and Vicodin, but advised plaintiff that he would need to contact his primary care physician and psychiatrist immediately for follow-up care.  (A.R. 641). Plaintiff returned to the emergency room on February 23, 2007.  He received prescriptions for Robaxin and Ultram.  (A.R. 638-39).

X-rays on of plaintiff chest and lumbar spine in March and April 2007, returned normal results.  (A.R. 325-26).  On March 10, 2007, plaintiff appeared at the Spectrum Health emergency room with complaints of back pain.  His straight leg raising tests were negative.  He had excellent strength in his legs bilaterally.  He was provided with a prescription for a dozen Vicodin ES tablets and was advised to follow-up with his primary care physician.  (A.R. 478).  Plaintiff returned in April with a complaint that he had twisted his right ankle.  He was provided with a prescription for ibuprofen, but he requested "something stronger."  He received 2 Vicodin tablets. (A.R. 476).

On May 30, 2007, plaintiff complained of back pain and anxiety.  He reported that he walked every day for 2 hours (approximately 5 miles), did 50 pushups every day, and lifted weights.  A physician's assistant at Creston Medical Center approved prescriptions for Darvon and Ativan and approved a three-week course of physical therapy.  (A.R. 335).

On June 25, 2007, plaintiff appeared at the Spectrum Health emergency room with complaints of anxiety and difficulty sleeping.  He reported that he was "starting a new program in Muskegon to become a radiation technologist" and indicated that it was the "likely source of his anxiety."  Plaintiff stated that he had "a long history of panic attacks that started around age 17." Plaintiff stated that he smoked ½ pack of cigarettes per day, but denied alcohol or drug use.  (A.R. 473).  He received a prescription for Ativan and was advised to establish care outside the emergency department.  (A.R. 474).

On August 2, 2007, plaintiff returned to Creston Medical Center and reported that he walked, lifted weights, and skated on his roller blades 4 or 5 days a week for exercise.  He

-14-

reported that he was having problems with his nerves and difficulty sleeping, but his mood was a little better on Celexa.  (A.R. 331-32).

On August 7, 2007, police were contacted after a pharmacist discovered that plaintiff was writing and calling in prescriptions under his father's name.  In addition, he had obtained prescriptions from multiple doctors and pharmacies.  Plaintiff was calling in prescriptions for "Marlene Roberts," and then picking them up.  (A.R. 354).  On August 13, 2007, Dr.  App sent plaintiff a letter by certified mail notifying him that he had been discharged as a patient because it had been discovered that he was using multiple doctors in order to obtain prescription  medication.  (A.R. 315-16, 354).

On August 14, 2007, plaintiff appeared at Advantage Health seeking pain medications.  His "drug-seeking behavior" was noted.  He received a referral to "Dr. Fox (psych/chronic pain)."  (A.R. 357-58).

On August 15, 2007, plaintiff appeared as a new patient at the St. Mary's Health Care Heartside Clinic.  As a new patient, he was asked to fill out a "Self-Reporting Medical History." Among other things, plaintiff stated that he had never had a problem with "substance abuse (alcohol, prescription drugs, cocaine, marijuana, heroin)."  (A.R. 377).  Plaintiff complained of reoccurring back pain and stated that he had hurt his back two or three days earlier while lifting "40-pound boxes" at work.  (A.R. 384).  He stated that he was currently taking Darvon, Ativan, and Ambien. He reported that he took "Ativan for anxiety and the Ambien for insomnia, though he ha[d] never officially been diagnosed by a psychiatrist."  (A.R. 384).  Plaintiff was alert, oriented, pleasant, and cooperative.  He did not appear to be uncomfortable.  He had a full range of motion in his lower extremities with no numbness or tingling.  The pain that he reported did not radiate anywhere.

-15-

Plaintiff was diagnosed with a low back strain and was "given a prescription for Soma, as that [was] his muscle relaxant of choice." (A.R. 384). Plaintiff was provided with Celebrex samples. His requests for prescriptions for Darvon, Ativan, and Ambien were denied. (A.R. 384).

On August 23, 2007, plaintiff appeared at the Spectrum Health emergency room complaining of anxiety. He complained of "severe anxiety for the last two weeks" and stated that he had experienced panic attacks for "about 1 year, but [those] had been off and on." (A.R. 471). Plaintiff was treated and discharged with a prescription for Ativan and a follow-up appointment with a psychiatrist on August 29, 2007. (A.R. 472).

On August 27, 2007, plaintiff appeared at the emergency room. He reported that he smoked cigarettes, but denied use of alcohol or drugs. (A.R. 420). On August 30, 2007, plaintiff appeared at the Heartside Clinic. He related that he had been to the emergency room for anxiety and pain and had received Dilaudid for pain and Ativan for his nerves. He conceded that he had been abusing Soma by taking more medication than had been prescribed. An attending physician's assistant explained that the scope of his practice did not include anti-anxiety medications, and that plaintiff needed an examination by a doctor before the pain medications that plaintiff wanted would be prescribed. Plaintiff did receive a prescription for Celebrex for pain and Benadryl to help him sleep. (A.R. 383).

Plaintiff received a brief period of "detox" treatment at the Salvation Army Turning Point Programs. He was admitted to the detox unit on September 4, 2007. Plaintiff reported that he had been arrested for driving while intoxicated in 1990 and 1993, and that he had "driven under the influence since then but ha[d] not been caught." (A.R. 447). Plaintiff had an associate's degree and was working on a bachelor's degree. He was enrolled in a program to become a certified

nurse's assistant. (A.R. 447). Plaintiff reported that he drank a liter or 20+ beers on a daily basis. "He last used a week prior to treatment [when] he had 18 12 ounce beers." (A.R. 451). Plaintiff reported that he first used marijuana at age 15 and that he used it on a daily basis in high school. He said that he had stopped using marijuana because it was causing panic attacks, but he admitted recent use and refused to provide further specifics. He admitted "paired use of alcohol and Ativan." He reported that she was "spending a great deal of time in alcohol and drug related activities." He stated that he had been fired from his job "for drinking and not showing for work." (A.R. 451). A few days later, plaintiff wanted to leave Turning Point because he wanted to detox at home and he did not believe that he was receiving enough medication. On October 12, 2007, plaintiff's "eyes were dilated and glassy." His drug screen was "positive for benzodiazepines, opiates, and oxycontin." (A.R. 438).

On September 12, 2007, the MRI of plaintiff's lumbar spine showed a "mild degenerative disc bulge at L5-S1. No convincing evidence of neural compression" was observed. (A.R. 386). On September 26, 2007, plaintiff appeared at the Spectrum Health emergency room seeking pain medication. He had no radicular symptoms, weakness or numbness. His strength was 5/5 in his lower extremities and sensation was intact. He was not acutely anxious. He received a prescription for "2 days worth of Soma." He also received a prescription for "2 days worth of Klonopin" because the physician at Spectrum, "felt [it] would have less abuse potential and give him longer duration action for controlling his anxiety." (A.R. 469). The next day, plaintiff returned to the St. Mary's Health Care Heartside Clinic seeking medication refills. He stated that he would like to switch back to Soma, needed a refill on Darvocet, and would like to try Paxil instead of Prozac.

-17-

Plaintiff admitted going to Spectrum-Butterworth emergency room where he received medication because he "couldn't see [a] psychiatrist for [a] long time."  (A.R. 380).

In October 4, 2007, plaintiff appeared at the Browning Claytor Health Center and received treatment provided by Dr. Vortia.  Dr. Vortia explained that narcotic medication was not plaintiff's best option for treatment of his low back pain.  Dr. Vortia authorized a course of physical therapy.  Dr. Vortia considered plaintiff's complaints of anxiety, but declined to prescribe any medication until she had records regarding earlier treatment.  (A.R. 462).  When plaintiff returned on October 12, 2007, he stated that he had injured his back at work while lifting a box of chicken wings.  (A.R. 459).  Plaintiff's motor strength was 5/5.  He had "mild" paraspinal muscle tenderness. plaintiff was advised to lose weight and attend physical therapy sessions.  He was reminded that Dr. Vortia's treatment plan did not include "chronic narcotics."  (A.R.  460).

Plaintiff returned to the emergency room on October 15, 2007.  He reported back pain that radiated down his legs.  He stated that he did "a lot of yard work" a day earlier and woke up with back pain.  When plaintiff was asked about the treatment that he had received for his back pain, he failed to disclose the fact that he had recently been to the emergency room and received treatment and prescription medication.  Plaintiff was advised that "it would not be in his best interest to constantly come to the emergency department for treatment of his chronic pain."  He received treatment and was discharged with a prescription for Vicodin.  (A.R. 467).

On October 17, 2007, plaintiff related to a therapist at Network 180 that he was "no longer going to Turning Point after registering positive on a drug screen for opiates."  (A.R. 432). Plaintiff revealed that he had a long history of polysubstance abuse.  (A.R. 432).  Plaintiff blamed his friends and a lack of support for his relapses into substance abuse.  (A.R. 432).

-18-

On October 17, 2007, plaintiff appeared at the St. Mary's emergency department. Plaintiff reported that he had been "moving a lot of furniture around last night and he thinks he might have pulled something." (A.R. 627). Plaintiff's straight leg raising tests were negative. He had no difficulty walking. He was not in any acute distress. Plaintiff had no neurological deficits. He was treated with Toradol. He was provided with a prescription for Darvocet rather than Vicodin. The prescription was for only 12 pills and plaintiff was advised to follow-up with his physician. (A.R. 628).

On October 23, 2007, plaintiff made a telephone call to Network 180 to discuss his treatment preferences. "Tom said that he would like to be funded for methadone, and titrate down in dose until he can comfortably go to Suboxone. Tom has never attended a residential program, and has very limited experience with gaining recovery. He does not meet the criteria for funding for methadone through Network 180." (A.R. 433). Plaintiff was authorized for physician visits, labs, and medication reviews, but he would be required to self-pay for the methadone. (A.R. 433).

On October 26, 2007, Dr. Vortia informed plaintiff that she would not be supplying plaintiff with any replacement for 'lost' prescriptions today." (A.R. 458). Dr. Vortia further informed plaintiff that he/she would not be providing him with prescriptions for narcotics or benzodiazepines at any time:

- Review of MAPS shows persistent narcotic & benzodiazepine seeking behavior at numerous clinics. Also appears to use his father's DEA [number] numerous times to fill med-[illegible].

- Will not provide any narcotics or benzodiazepines.

(A.R. 458).

On November 26, 2007, plaintiff appeared at the Spectrum Health emergency room. He reported that he was starting nursing school. He stated that he was experiencing anxiety. He denied alcohol or drug use. He obtained a prescription for Xanax. (A.R. 466).

On December 7, 2007, plaintiff was discharged from treatment at Turning Point. His course of treatment concluded with the following series of events:

> On 10-15-07 he requested a reassessment for the Suboxone program. When he returned on the 19th he admitted his ambivalence about sobriety. On 10-25-07 he admitted that he had been taking Xanax and was now tapering off and that he had gone to Project Rehab and been placed on methadone. When confronted by others he admitted that he was "thinking I should quit everything." He did not attend more sessions although he left a phone call stating that he would return on 12-03-07 after completing CNA training. His case was closed for non-attendance.

(A.R. 438). Plaintiff's diagnosis on discharge was opioid dependence, sedative, hypnotic, or anxiolytic dependence, alcohol dependence, substance induced mood disorder, dysthymia, and cocaine abuse. (A.R. 439).

On February 2, 2008, plaintiff appeared at the emergency room at St. Mary's Health Care complaining of back pain. He was treated with Norflex, Toradol, and Vicodin and discharged. (A.R. 624). Plaintiff returned to St. Mary's on February 13, 2008, with complaints of anxiety. He was treated with Xanax and discharged. (A.R. 621-22). Plaintiff returned on February 17, 2008, with complaints of chest pain and shortness of breath. (A.R. 612). His chest x-rays returned normal results. (A.R. 616). He stated that he had recently "restarted" smoking. (A.R. 613). Plaintiff denied use of alcohol. He reported that he quit drinking in November 2007, and stated that he was a "moderate drinker prior to that." (A.R. 613). He was treated and discharged with a prescription for Xanax. (A.R. 612-14).

On March 17, 2008, plaintiff returned to St. Mary's with complaints of right thumb pain. (A.R. 607). He reported that he had injured it 3 weeks before his arrival at the emergency room. He was in no acute distress and his sensation and motor function were normal. X-rays showed no evidence of fracture. (A.R. 608). Plaintiff stated that pain medications offered did not work, and that he wanted stronger medications. This request was refused because reports indicated that plaintiff was seeing multiple doctors and multiple pharmacies and a new script "about every 3-4 days." (A.R. 609). Plaintiff was diagnosed with a thumb sprain and advised to follow up with his primary care physician if he thought it was necessary. (A.R. 610). On the same date, plaintiff appeared at the Spectrum Health emergency room seeking pain medication. Dr. Pham noted plaintiff's history of seeking benzodiazepines and narcotics at emergency rooms. Dr. Pham informed plaintiff that she was aware that he was in a methadone program. Plaintiff's response was that he was no longer in the methadone program. Dr. Pham advised plaintiff that he would not be receiving any narcotic medications. (A.R. 681-82).

Plaintiff's disability insured status expired on March 31, 2008. On March 31, 2008, Elbin Orellana, M.D., performed an initial evaluation (A.R. 556-57), which was followed by a total of six medication reviews. (A.R. 558-64). On March 31, 2008, plaintiff stated that he graduated from high school in 1988. He "completed four years of college with a major in nursing." (A.R. 557). Dr. Orellana noted that plaintiff had "never been hospitalized for psychiatric reasons." (A.R. 556). His only outpatient treatment had been his brief "detox" at Turning Point. Plaintiff complained that his anxiety had been "more overwhelming" when he stopped drinking and using marijuana. (A.R. 556). He found that plaintiff was oriented to time, place and person. There was no evidence of hallucinations, delusional thinking, or paranoid ideation. (A.R. 494). Dr. Orellana

gave plaintiff a current GAF score of 45 and estimated that his highest GAF in the past year had been 55. Dr. Orellana offered a diagnosis of a generalized anxiety disorder and major depression, recurrent, unspecified. (A.R. 557). Dr. Orellana began treating plaintiff with a trial of Abilify and Xanax and directed plaintiff to stop seeking medication from other sources: "He understood that this will be the only prescription for Xanax that he will get and that he is not to see any other doctor to prescribe medications for anxiety or panic attacks. He will return in four weeks for medication management. He was encouraged to consider treatment at Project Rehab." (A.R. 557).

On April 9, 2008, plaintiff reported to doctors at the Spectrum Health emergency room that he had a sore thumb. He stated that he "work[ed] on a computer often and also reportedly as a cook." (A.R. 676). X-rays of plaintiff's thumb returned normal results. (A.R. 676-77).

On April 14, 2008, plaintiff received a consultative psychological evaluation performed by Psychologist Jeffery Kieliszewski. Plaintiff stated that panic attacks and depression prevented him from working. Plaintiff reported that he was being treated with "Abilify and Paxil. He [was] also treated with Ativan." He had "never been involved in any mental health counseling." (A.R. 496). Psychologist Kieliszewski noted plaintiff's lack of candor in his answers to questions regarding substance abuse:

> When I inquired about substance abuse history, Thomas reported that he had alcohol problems in the past. However, he claims he has not used alcohol in approximately a year. He denied a history of difficulty with abuse of illegal drugs or prescription medications. However, the records contradict Thomas's reports. The records detail a great deal of drug seeking behavior on Thomas's part. There is also indication in the records to indicate Thomas has been in treatment through a Methadone clinic due to drug addiction problems with prescription pain medications. The records also indicate pharmacy records were obtained by one physician and indicated use of multiple pain medications.

(A.R. 497). Psychologist Kieliszewski observed "[n]o legitimate impairment in mentation." (A.R. 497). Plaintiff was oriented in all three spheres. His recent and remote memory was intact.

Kielieszewski found that plaintiff's report indicated "long-standing, mild depression." Plaintiff also reported significant anxiety and panic attacks. Plaintiff appeared to be "afflicted with serious substance abuse problems," including street drugs and "particularly with abuse of prescription medications and associated drug seeking behavior." (A.R. 499). Psychologist Kielieszewski offered a diagnosis of polysubstance dependence, generalized anxiety disorder, panic disorder without agoraphobia, and a dysthymic disorder, and gave plaintiff a GAF score of 58. (A.R. 499).

Plaintiff appeared at the Spectrum Health emergency room on May 23, 2008. He complained of anxiety. Plaintiff did not appear overly-anxious and he was not in any acute distress. Other than some forced speech and excited tone, plaintiffs's examination was "unremarkable."

On June 4, 2008, plaintiff complained that he was experiencing back pain and anxiety. Medical staff at the St. Mary's Health Care emergency room found that plaintiff was alert, oriented in all three spheres and not in any acute distress. His strength was 5/5. Plaintiff received 2 Darvocet tablets and 1 mg. of Ativan. (A.R. 659-60).

On June 19, 2008, plaintiff appeared at the emergency department at St. Mary's Health Care with complaints of anxiety attacks. (A.R. 601). He was alert and oriented in all three spheres. He was not in any acute distress. He reported that his physician had increased his Paxil a month earlier, and that it had provided no relief of his anxiety today. He stated that he had an appointment scheduled with his psychiatrist for June 30, 2008. He gave a social history in which he denied the use of alcohol and drugs. His range of motion was intact and his strength was 5/5 in his upper and lower extremities. He was treated with Ativan and discharged. (A.R. 602). He returned on June 21, 2008. (A.R. 603). He was alert and oriented in all three spheres. His behavior and appearance were within normal limits. He had a normal range of motion. He ambulated with

-23-

a steady gait.  (A.R. 604).  Plaintiff was treated with Ativan.  He was instructed to take the Paxil that

had been prescribed and to follow-up with his primary care physician.  (A.R. 605).

On June 30, 2008, plaintiff returned to Dr. Orellana for a medication review.  He

denied using cocaine.  He stated that he had been sober from opiates and alcohol.  He related that

he had obtained Paxil from the Metro Clinic, but did not feel that it was helping him.  Dr. Orellana

initiated a trial of Symbyax and reiterated that he would be treating plaintiff with medications that

were non-addictive.  (A.R. 558).  Plaintiff returned for another medication review on October 16,

2008.  (A.R. 559).  Plaintiff stated that he had been addicted to opiates and that he was taking

methadone prescribed by Dr. Campbell.  Plaintiff reported that he "was tried on Suboxone, but was

not able to handle it."  (A.R. 559).  Plaintiff reported that he was agitated, but his memory and

concentration were grossly intact.  He was oriented to time, place, and person.  There was no

evidence of hallucinations, delusional thinking, or paranoid ideation.  Dr. Orellana initiated a trial

of Zyprexa.  (A.R. 559).  In November 2008, plaintiff was advised to cut down his caffeine intake

which appeared to be triggering some of his panic attacks.  Plaintiff related that Zyprexa had helped

and stated that he had not experienced any panic attacks in the last four weeks.  (A.R. 560).

On September 12, 2008, plaintiff asked a social worker at Network 180 for "whatever

treatment would be available the soonest."   (A.R. 547).  Plaintiff "reported struggling with

uncontrollable opiate abuse; most recently Thomas has been ingesting about 30 Vicodin (7.5 mg or

5 mg) pills per day, nearly every day.[7]  He also reported recent use of OxyContin, alcohol and

nicotine."  Plaintiff expressed a belief that his mental health symptoms were "directly related to his

---

[7]Plaintiff testified that he was obtaining Vicodin "off the street."  (A.R. 52).  Plaintiff stated
that figure of 30 Vicodin per day was an "exaggeration."  (A.R. 52).  Plaintiff testified that he was
drinking "twelve to eighteen beers," every other day.  (A.R. 53).

drug use and corresponding life circumstances."  (A.R. 547).  Plaintiff related that he had been "unable to maintain even short periods of voluntary abstinence."  (A.R. 549).  He "reported a history of intermittent employment as a Certified Nurse's Aid and was most recently working, one month ago, at Luther Home.  Thomas described himself as unable to maintain employment due to his drug use and drug seeking behaviors."[8]  (A.R. 549).  "With prompting, Thomas reported having a history of over-using emergency rooms and/or physicians to gain access to opiates.  He indicated several doctors have refused to provide any additional medications for him due to concerns about his misuse of opiates."  (A.R. 550).

On November 13, 2008, Dr. Orellana conducted a medication review.  Plaintiff reported that he had "been doing fairly well staying away from the benzos" that he had not been to the hospital "in a long time."  (A.R. 560).  He reported that he was experiencing less agitation while he was taking Zyprexa and that he had not experienced a panic attack in four weeks.  Plaintiff continued to see "Dr. Campbell who [was] treating him with Suboxone for the addiction to opiates." He was oriented as to time, place, and person and his memory and concentration were grossly intact. There was no evidence of delusional thinking, paranoid ideation, suicidal or homicidal thoughts. His insight and judgment remained poor.  Dr. Orellana continued plaintiff's prescription for Zyprexa and gave him a prescription for Trileptal to address plaintiff's complaints that he was having difficulty sleeping.  (A.R. 560).

On December 4, 2008, plaintiff returned to the emergency room at St. Mary's Health Care.  (A.R. 598).  Plaintiff stated that a week earlier he had stopped taking Paxil because he did not

---

[8]When the ALJ asked plaintiff whether he made the statement that he "unable to maintain employment due to his drug use and drug seeking behaviors," plaintiff's response was, "I don't recall."  (A.R. 55).

like the way it made him feel.  He reported that he had appointment with a psychologist on December 12, 2008.  Plaintiff complained of financial problems and recent loss of a job and holiday season stress.  He was not in any acute distress.  He was alert and oriented.  Plaintiff was treated with Ativan and discharged.  (A.R. 599-600).

On January 15, 2009, plaintiff told Dr. Orellana that he felt trapped because he had to go to the methadone clinic every day.  He discussed attempting to get off methadone, but expressed fear of experiencing withdrawal symptoms.  (A.R. 561).  Dr. Orellana encouraged plaintiff "to sign a release of information to coordinate treatment with Dr. Campbell since that last time he was seen he mentioned he was on Suboxone, and now he's on Methadone."[9]  (A.R. 651).

On March 12, 2009, Dr. Orellana noted that plaintiff was "manipulative and demanding.  Every time that he has requested Benzo's, he has been told that he cannot get them at this facility as they are not the right medications for him.  He complained of not sleeping.  He was willing to try Seroquel instead of Zyprexa.  He apparently has been going to the emergency rooms and gets prescriptions of Benzo's off and on."  (A.R. 562).  Plaintiff's current GAF was 55.  Dr. Orellana terminated plaintiff's prescription for Zyprexa and initiated a trial of Seroquel.  (A.R. 562).

On April 16, 2009, Dr. Orellana continued to express significant concern regarding plaintiff's drug-seeking behavior:  "He obsesses about wanting to get a medication that would give him immediate relief.  He stated that he would like to have Schedule II medications prescribed without even knowing which medication he was referring to.  He had been off benzo's since he has been treated at this facility except for when he gets it from other doctors.  He was educated again

---

[9]There is no evidence that plaintiff signed any release.  Dr. Campbell was plaintiff's treating physician for his drug addiction.  (A.R. 263).  Plaintiff did not file Dr. Campbell's treatment records in support of his claims for DIB and SSI benefits.

to the fact that he needs to be sober in order for the medications to work.  He stated that he was not using alcohol or substances except for methadone."   Dr. Orellana stated that plaintiff appeared less drowsy and sedated than in the past, but continued to give him a current GAF score of 55.  (A.R. 563).

On May 9, 2009, plaintiff appeared at the St. Mary's Health Care emergency room. He complained of an anxiety attack. (A.R. 593).  Plaintiff stated that he had an appointment scheduled for mid-June "to see Dr. Vortia for a first appointment," but claimed that he did not have a doctor until then, and came into the emergency room "just to get routine maintenance."  (A.R. 593).  The treatment plan was to get plaintiff on "Xanax as needed until he [could follow up with Dr. Vortia."  (A.R. 594).  On May 17, 2009, plaintiff returned to the emergency room. (A.R. 591). He complained of low back pain.  He was provided with prescriptions for Bactrim double strength, Robaxin, and Relafen.  (A.R. 292).

On December 20, 2009, plaintiff appeared at the emergency room at St. Mary's Health Care.  (A.R. 583).  He reported that he ran out of his prescription for Ativan and wanted a refill.  He stated that he had a new primary care physician, Mark O'Brien, M.D.  He stated that he had an appointment with Dr. O'Brien on December 28, 2009.  Plaintiff was treated, discharged with a prescription for Ativan, and directed to keep his appointment with Dr. O'Brien.  (A.R. 584).

Plaintiff attended his appointment on December 28, 2009.[10]  Plaintiff reported that he lost a job that he apparently anticipated on "New Year['s Day]."  He stated that Zoloft "failed." (A.R. 577).  Dr. O'Brien initiated a trial of Wellbutrin.  (A.R. 577).

---

[10]Plaintiff testified that he began seeing Dr. O'Brien on December 28, 2009.  (A.R. 57).

On December 31, 2009, plaintiff appeared at the Spectrum Health emergency room. He reported that he had been a driver involved in an auto accident a day earlier. Plaintiff reported that he told that police that he did not want to be seen at a hospital. Plaintiff complained of back pain and a scalp abrasion. The CT scan of plaintiff's head returned normal results. The CT scan of his spine was "essentially read as no fracture or subluxation. There [was] some loss of lordosis seen." (A.R. 582). Plaintiff expressed significant dissatisfaction with the treatment plan followed by his care providers at Spectrum Health:

> Patient, initially upon this evaluation, was requesting something as far as muscle relaxant was concerned. He was asking for Soma. The patient does have an active care guide plan that was dated most recently on December 7, 2009 by a Dr. out of St. Mary's Healthcare affiliated with Breton Clinic Healthcare, and the care plan clearly states to avoid use of benzodiazepines or narcotic due to concerns with a history of dependence in the past. Although the patient complains of some discomfort, he does not appear to be in any acute distress at this time. I did obtain the x-ray results as above as well as the CT scan and did discuss this care plan with him. We did give him Toradol 30 mg IM and I did offer him Robaxin for a muscle relaxant in place of the Soma he was requesting. Patient states that upsets his stomach as well as Flexeril. Although patient is taking Ativan, I felt that that was adequate for his symptoms at this time and felt any additional pain medication or muscle relaxant should be obtained through his primary care physician, and referred him back to his primary care. Patient was upset secondary to the care plan. He stated that he currently sees Dr. O[']Brien now. He does not see that doctor and he has not seen any doctor in multiple years, as many as 7 years, although the care plan says otherwise. I explained to him once again to speak to Dr. O[']Brien and talk with the previous physician to discuss the care plan as recommended. Otherwise, I felt that his treatment here particularly for his pain and discomfort was adequate, and the patient was discharged home in stable condition.

(A.R. 582).

On January 11, 2010, plaintiff told Dr. O'Brien that he had "totaled" his car in an accident on January 6, 2010. This was far removed from the date in December 2009, that plaintiff told the physicians at the Spectrum Health emergency room.[11] On January 11, 2010, complained

---

[11] There are no emergency room records dated December 30, 2009, or January 6, 2010, in this administrative record.

of increased back pain anxiety stemming from his alleged accident.  Dr. O'Brien increased

plaintiff's Ativan and Klonopin and gave him a prescription for Vicodin for pain relief.  On January

14, 2010, Dr. O'Brien noted "opiate dependence" and he approved a prescription for Suboxone.

(A.R. 575).  On February 2, 2010, plaintiff reported that the opiates were "gone."  O'Brien's

progress notes suggest that he gave plaintiff a prescription for Zoloft.  (A.R. 574).

On February 16, 2010, plaintiff appeared at the St. Mary's Health Care emergency

room complaining of panic attacks.  His drug screens were positive for opiates and benzodiazepines.

He was provided with a "very small" quantity of Ativan and discharged.  (A.R. 579-80).  On March

9, 2010, plaintiff appeared at Dr. O'Brien's office.  Plaintiff reported that he only occasionally

needed Ativan and Klonopin.  He stated that Suboxone was "a miracle," and "really help[ed]."

(A.R. 573).  On the same date, Dr. O'Brien stated that plaintiff was "unable to function due to

anxiety."  (A.R. 538).

On March 25, 2010, Psychologist Steven Harris conducted a consultative evaluation

and offered his opinion that plaintiff was unable to work.  (A.R. 538-45).  Psychologist Harris's

opinions are addressed in greater detail in section 3.

Plaintiff is correct that Dr. Orellana's name does not appear ALJ's opinion.  That is

because the ALJ addressed the evidence generated by Dr. Orellana by its exhibit number, Ex. 20F.

The ALJ adopted Dr. Orellana's diagnosis in his factual finding regarding plaintiff's severe

impairments:

> Initially, claimant was diagnosed with opioid dependence, generalized anxiety disorder,
> major depressive disorder, and alcohol abuse.  The following months, his diagnosis details
> showed generalized anxiety disorder and major depression, recurrent, unspecified (Ex 20F).

* * *

When claimant was using drugs his diagnosis was opioid dependence, generalized anxiety disorder, major depressive disorder, and alcohol abuse. Ongoing compliance with treatment showed diagnosis of generalized anxiety disorder and major depression, recurrent, unspecified and overall improvement (Ex. 20F).

(A.R. 29-30). A more lengthy discussion might have been necessary under the treating physician rule if Dr. Orellana's opinion had been more supportive of plaintiff's claims for DIB and SSI benefits. As previously indicated, GAF scores are subjective rather than an objective assessment. Dr. Orellana indicated that plaintiff's condition was improving with treatment despite his persistent non-compliance with directives not to seek medication elsewhere. Dr. Orellana never offered an opinion that plaintiff was disabled. He did not opine that plaintiff would be unable to perform the requirements of "work, limited to simple, routine and repetitive tasks in a work environment free of fast-paced production requirements, involving simple, work related decisions; with few, if any, work place changes." (A.R. 27). I find no error.

Plaintiff argues that the ALJ should have given greater weight to opinions provided by Psychologist Stephen Harris. (Plf. Brief at 18-20). Psychologist Harris saw plaintiff on one occasion, March 25, 2010. Following this consultative examination, Harris offered a diagnosis of panic disorder with agoraphobia, generalized anxiety disorder, major depressive disorder, recurrent, obsessive compulsive personality traits, a GAF score of 25. (A.R. 539-45). On July 1, 2010, Harris marked boxes on a form offering his opinions that plaintiff was disabled "without consideration of any past or present drug and/or alcohol abuse," that drug and/or alcohol abuse was not a material cause of plaintiff's disability, and that plaintiff was not currently using drugs and/or alcohol and remained disabled. (A.R. 649). On the same date, Harris completed a RFC questionnaire. (A.R. 651-58). Psychologist Harris was a consultative examiner, not a treating physician. Because Harris was not a treating physician, the ALJ was not "under any special obligation to defer to his opinion[s]

-30-

or to explain why he elected not to defer to [them]." *Karger v. Commissioner*, 414 F. App'x 739,

744 (6th Cir. 2011); *see Peterson v. Commissioner*, 552 F. App'x 533, 539 (6th Cir. 2014).

Nonetheless, the ALJ carefully considered Psychologist Harris's opinions and found that they were

not persuasive:

> In March 2010, Dr. Harris, a psychologist evaluated claimant. He reported having two alcohol related driving offenses. He has a driver's license at present, and stated that he quit drinking alcohol two years ago, and stopped using marijuana many years ago. He lives with his father and has contact with family but withdraws and isolates at home. Regarding his daily activities, claimant reported that he gets out of bed, not because he wants to but feels that he should. He avoids going out or driving. He will sometimes do a little laundry but is not efficient at it. He did not endorse the inability to cook, clean, sweep, mop, or vacuum, he just denied doing these things. He will use the microwave or eat junk food and drink sodas. He may go two or three days without showering. The examiner noted claimant has a tendency to blame others but he was cooperative. His thought processes were logical and organized, and although his speech was not always articulate, it did reflect goal directed thinking. his concentration was impaired but his memory functions appeared to be intact. He was oriented times three and presented with a clear sensorium. Unlike recent memory, his past memory was functional and adequate (Ex 19F, 21F).

> The examining psychologist assigned claimant with a GAF of 25, which would indicate his behavior is considerably influenced by delusions or hallucinations, or serious impairment in communications or judgment or inability to function in almost all areas. Although the claimant has some limitation of functioning, I note that he is living with family and has family contact. He does not stay in bed all day. He goes out and drives. He does laundry. He uses a microwave, feeds self and does personal care. He reports thoughts of suicide but never acted on them. The examiner indicated that claimant provided the information for the interview without evidence of assistance or prompts. The claimant's level of functioning is not consistent with the GAF score of 25; therefore, I do not accept this opinion regarding claimant's level of functioning (Ex 19F, 21F).

> * * *

> In July 2010, Dr. Harris reported that in his opinion, claimant is totally disabled without consideration of any past or present drug and alcohol use. Drug and/or alcohol use is not a material cause of this individual's disability. Claimant is currently not using drugs and/or alcohol and remains disabled (Ex 23F). However, claimant attributed his limited self-care to "doing drugs or trying to figure out how I can get more drugs."

> * * *

-31-

Dr. Harris also indicated that claimant is markedly limited in the area of understanding and memory, sustained concentration and persistence, social interactions, and adaptation. Clearly, Dr. Harris's opinions are inconsistent in his evaluation to his assessment. Conversely, in March 2010, Dr. Harris was of the opinion that claimant's thought processes were logical and organized (not markedly limited), he had goal directed thinking (not markedly limited), his concentration was impaired (not markedly limited) and his memory functions were intact (not markedly limited). He was oriented times three and presented with a clear sensorium (not markedly limited). His past memory was functional and adequate (not markedly limited). He isolates. "He fails to fully appreciate the extent of his own responsibility in his social and vocational maladjustment." This is not a clear indication of marked limitation. (Ex 19F, 21F). Dr. Harris indicated that the claimant has a low I.Q. but there are no valid I.Q. scores in the file. He indicated that the claimant would be absent more than three days of work a month but fails to explain why. Dr. Harris indicated that the claimant did not finish high school because of psychological problems. Claimant testified that he started using marijuana in high school. Dr. Harris indicated that  for all the claimant's deficits in functioning, he is capable of managing his benefits (Ex. 24)  I do not give Dr. Harris' opinions significant weight because his reported findings on evaluation are inconsistent with his assessed level of functioning (Ex 24F, 19F, 21F). Claimant's activities of daily living are not indicative of an individual who cannot get out of bed on a consistent basis. Although he may not be motivated to get up and work, there is no evidence that establishes he is unable to do so. I do not accept Dr. Harris' opinions.

(A.R. 29-30). The ALJ is responsible for weighing conflicting medical opinions, not the court. *Buxton*, 246 F.3d at 775; *accord White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009). The ALJ's decision to give little weight to Psychologist Harris's opinions is well-supported and entirely consistent with applicable law.

## 4.

Plaintiff makes a passing argument in his reply brief that the ALJ committed reversible error under the treating physician rule in the weight he gave to Dr. O'Brien's statement that plaintiff was "unable to function due to chronic anxiety." (Reply Brief at 4). Plaintiff waived this argument on multiple levels. The argument is deemed waived because it was not included in plaintiff's statement of errors. *See Waly v. Commissioner*, 594 F.3d 504, 513 (6th Cir. 2010); *see also Nichols v. Commissioner*, No. 1:12-cv-995, 2014 WL 4259445, at * 1 (W.D. Mich. Aug. 28,

2014).  Further, the argument is deemed waived because it was made for the first time in plaintiff's reply brief.  Raising a new argument in his reply brief is improper, and constitutes a violation of the court's order directing the filing of briefs. (docket # 12).  It is well established that a reply brief is not the proper place to raise new arguments.  *See e.g.*, *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).  "A reply brief is the plaintiff's opportunity to respond to arguments raised for the first time in the defendant's brief.  A plaintiff cannot wait until the reply brief to make new arguments, thus effectively depriving the opposing party of the opportunity to expose the weaknesses of plaintiff's arguments."  *Morris v. Commissioner*, No. 1:11-cv-154, 2012 WL 4953118, at * 10 n.8 (W.D. Mich. Oct. 17, 2012).

Even assuming that the argument had not been waived, it is meritless.  On March 9, 2010, Dr. O'Brien wrote a conclusion that plaintiff was "unable to function due to chronic anxiety." (A.R. 538).  He did not describe how plaintiff was unable to function or what he could not do.  He made no reference to any documents supporting the conclusion.  The ALJ found that this statement was "of little value with respect to assessing what the claimant can do regarding work-related activities," and found that it was entitled to no weight.  (A.R. 30).  It is well established that the ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."  *Buxton v. Halter*, 246 F.3d at 773.

### Recommended Disposition

For the reasons set forth herein, I recommend that the Commissioner's decision be affirmed.

Dated:  November 10, 2014          /s/  Phillip J. Green
                                   United States Magistrate Judge

-33-

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008).  General objections do not suffice.  *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).